## Case No. 7,310.

### JEWETT v. CUNARD et al.

[3 Woodb. & M. 277.] [1]

Circuit Court, D. Maine. Oct. Term, 1847.

[1] [Reprinted from 1 N. B. R. 495 (Quarto, 131), by permission. 2 Am. Law T. Rep. Bankr. 7, contains only a partial report.]

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

Mr. Ellton and Gen. Fessenden, for complainant.

W. P. Fessenden and Mr. Kent, for respondents.

WOODBURY, Circuit Justice. The first question in this case, not connected with the merits, and which it seems important to settle before an examination of the merits, is in respect to the non-joinder of Bryce Jewett as plaintiff. He has, it is true, some interest in the contract between the Cunards and the plaintiff, having owed some of the debts separately, and others in conjunction with Joshua Jewett, and some interests in the property, having been a tenant in common in some of the estate named in the contract, both real and personal. But at the same time having been a lessee of the property afterwards from the Cunards, and alleged by Joshua Jewett to have been guilty of neglect and mismanagement of the estate, he is prosecuted for that, with the Cunards, as a respondent, and for misconduct as a lessee, and could not without an absurdity, prosecute himself for it as a co-plaintiff. The first answer then to this objection is this, that such conduct has since occurred as to the property and contract, by neglect and misbehavior, and which is one of the alleged grounds of recovery by this bill, that Bryce Jewett could not, as an agent charged with being guilty of that neglect, prosecute himself, but probably may well be made, as he is one of the respondents, alleged to have conducted unfaithfully towards the plaintiff. It is doubtful whether one tenant in common can ever join another in such a proceeding. Lothrop v. Arnold, 25 Me. 136. A second answer to the objection is, that Bryce Jewett had no interest whatever in some of the property sold by the Cunards, and no right, therefore, to damages for its misuse, and that portions of the contract were to Joshua alone, as if alone interested in them. 1 Story, Eq. Pl. §§ 75, 72, 276. The maxim thus well applies to such, "Reddenda singula singulis" ("Words may be transferred and distributed among several subjects, and have different meanings, as the matter differs, and as right requires"). 1 Spence, Eq. Jur. 540. So in 1 Spence, Eq. Jur. 545, it is laid down that "where the interest of the covenantees is several, they may maintain separate actions, though the language of the covenant be joint." See, also, 1 Saund. 153, 154, note; 4 Bing. (N. C.) 426. "Lord Coke mentions six several instances in which the joint words of the parties shall be taken respectively and severally," and one of them is if several interests of the grantors, as when tenants in common and another of the grantors exist. Windham's Case, 5 Coke, 8a. It is not only alleged here that the complainant owned some of the property alone, and some as tenant in common with Bryce, but that the value of his interest was seven-eighths of the whole. This is not denied, nor asked to be proved, and hence is virtually an admitted fact, and justifies a recovery by the complainant to that extent, if entitled to recover at all. Again, according to some of the allegations in the bill, and which are not denied in the answer, though some of the evidence might render it doubtful, Bryce Jewett in May, 1844, when the bill was filed, was a citizen of New Brunswick, and hence this court had jurisdiction over him as a defendant, but he could not have joined Joshua as a plaintiff, without defeating the jurisdiction over the Cunards, who are alleged to belong to the same province. Harrison v. Urann [Case No. 6,146]. By express statute, there is a provision as to the joinder of defendants, that you may not unite them in such cases. Act Feb. 28, 1839, § 1 [5 Stat. 321]; Herriot v. Davis [Case No. 6,404]; [U. S. v. Freeman] 3 How. [44 U. S.] 556. And it would not be a very forced construction of the concluding language of that statute, to extend it to the non-joinder of plaintiffs. There certainly would be nothing unreasonable in not joining them, if their interests were in part separate, and in part only that of tenants in common, as well as the contract being in part separate. Place v. Delegal. 4 Bing. (N. C.) 426. Again, the claims of Bryce Jewett may all have been settled or discharged, as seems probable by a writing, which he testifies in his deposition, as well as states in his answer, that he gave or intended to give to the Cunards. And for other reasons he might be unwilling, if he could, to risk the action so far as regards himself. Independent, however, of the consideration before named, I think he should join on strict legal principles. Hallett v. Hallett, 2 Paige, 18. In conclusion, then, on this point, as Bryce Jewett is now a defendant, and asks for such relief as the facts may justify, the parties are all on the record in form sufficient to justify such a decree as will not do injustice to any of them, on whichever side of the docket they may stand. 1 Story, Eq. Jur. 630; [Boone v. Chiles] 10 Pet. [35 U. S.] 177. In giving judgment for one plaintiff alone, we should, of course, go only to the extent of his interests, leaving the interests of the other, if not already adjusted out of court, to be settled equitably between him and the respondents in this or another action, on proper pleadings. 3 Johns. Ch. 555; Chamley v. Lord Dunsany, 2 Schoales & L. 718; Cross v. U. S. [Case No. 3,434]; West v. Randall [Id. 17,424]; 1 Smith, Ch. Prac. 90.

The next preliminary question is, whether the answer of the Cunards, not being expressly requested in the bill to be under oath, should be voluntarily sworn to and treated as evidence by the respondents, in their own favor. I do not deem it very material, whether the answer is to be weighed here as if duly sworn to, or not; considering that the leading facts in the case are made out satisfactorily by the testimony of more than one witness. But the course of practice is to have the answer sworn to, and to give it effect as such, when the plaintiff does not expressly state in his bill that he wishes to dispense with it, and when the court and the defendant accede to the proposition. The oath is the general rule, and the dispensing with it the exception. 2 Story, Eq. Pl. § 874; 1 Smith, Ch. Prac. 266. When the defendant cannot be present, the answer is taken under a commission, whose form requires it to be sworn to. 1 Spence, Eq. Jur. 372. What the form given to it should be, after taken, whether technically as evidence by the respondent, or as a bar to a recovery, till more than proof by one witness is adduced, is another question, and not very material, except as a matter of correct phraseology. Chief Justice Marshal and Judge Story have called it "evidence," and such is the ordinary term applied to it. Russel v. Clark, 7 Cranch [11 U. S.] 92; Cushman v. Ryan [Case No. 3,515]; Gould v. Gould [Id. 5,637]. But in strictness of phrase, perhaps, the answer is not evidence, but rather a portion of the pleadings,—rather a bar in the nature of a plea, and when sworn to, stands till overcome by more than one witness. 2 Daniel, Eq. Prac. 626; 6 Clark & F. 295. The oath to it is like the "decisory oath" in the Roman law, and stands as such, like a decision or bar, till disproved by stronger evidence. 1 Spence, Eq. Jur. 677. Yet it does not seem to violate much either good precedent or sound analogy, to call such an answer, when sworn to, in common parlance, "evidence."

We are now prepared to proceed to the consideration of the merits. In the threshold the respondents contend that their contract with the plaintiffs was a mere special contract which subjects them to pay nothing for the income of the property, unless it amounted to £550 in the first year from October 1st, 1830, to October 1st, 1831. They insist, also, on a strict construction of it, and if that sum was not then realized, that they are not bound in any other way, or on any other terms, to account for the estate itself, whether real or personal. That it must be considered as sold to them absolutely and irrevocably, looking to the conveyances themselves, and that the only modification of that view is by another subsequent and special contract, agreeing to reconvey or account, on terms, conditions or events, which last likewise have never been complied with. nor happened. Such cases may exist. See Bent-

ley v. Phelps [Case No. 1,331]; 14 Pick. 467; [Conway v. Alexander] 7 Cranch [11 U. S.] 237. But it is proper to say that this view of the transaction is, in the opinion of the court, not the true one, and more especially is it not in equity. The conveyances now in dispute, had been preceded by several others, of both real and personal estate, from the Jewetts to the Cunards, some of them on their face expressing that they were made to secure debts due to the Cunards and others, though absolute in form, manifestly intended merely as security for what the Jewetts owed the Cunards. Where the possession had been changed nominally, and leases back given to only Bryce Jewett, as was the case under one of the first contracts, the actual possession seems to have remained unaltered in Joshua, and so far from any of those conveyances being then deemed in truth a sale and the debts actually paid by them, the consideration is at times nominal, no prices whatever are agreed on, and the evidences of the debt are never surrendered, or receipts or releases executed of it.

Matters stood in this situation in October, 1830, when the Cunards, still considering themselves creditors of the Jewetts, and anxious to obtain better security for their debts, requested them to execute the new conveyances, including property in the old ones, as well as all the new estate, and extending down to the smallest articles, even to a "hammer" and "log canoe." The conveyance of the personal property bears date the 11th of October, 1830, and that of the real-estate September 30th, 1830, while the agreements on the part of the Cunards are dated the 1st of October, 1830. In order to remove any doubt that this transaction was but one throughout, though bearing different dates, and was designed only for security for the debts due the Cunards, the managing partner in his answer adds, "The execution of all the papers was one transaction, and according to the agreement between the parties before any papers were drawn," and further, "It was one agreement and one transaction." Next as to its being an agreement for security for a debt, and not a sale or mere special contract, it will be seen that the firm in the answer of Joseph, who was the acting partner in it at Chatham, admits that the previous confession of judgment was "for the security of the amount due said company from said Jewett:" that before the conveyance in October, "justice to himself and firm required that some arrangements should be made for the security of said debts, etc.," and after ascertaining the amount due, it was agreed between the parties that the said complainant should execute a deed of certain real and other estate, viz.: "lands and right of pre-emption under minutes in council to this defendant, and said Joshua and Bryce should execute a bill of sale of their personal property to said company, and that said company should execute a written contract and

agreement with said Jewetts, agreeing to reconvey said property, real and personal, upon certain conditions, which said agreement between the parties was, on said first day of October, 1830, carried into effect and said deed, bill of sale and contract were accordingly executed and delivered, and copies thereof are hereunto annexed and marked 'A,' 'B' and 'C,' respectively, and this defendant prays that the same may be taken as part of his answer. And this defendant further says that the terms of said contract marked 'C,' were not only satisfactory to the complainant at the time, but were actually proposed by him in the first instance, and assented to by this defendant, on behalf of said company, and this defendant was not only willing that said Jewett should redeem all said property, by the payment of their debts to said company, according to said contract. but was so desirous that said Jewett should redeem said property, that he actually and voluntarily proposed to them the terms of another and additional agreement on the part of said company, by which said company agreed to remit five hundred pounds of their debt, on being paid the residue thereof within a certain time, and the said company, by this defendant, executed and delivered to said Jewett a written contract to that effect, a copy of which is hereunto annexed, and marked 'D,' and this defendant prays that the same may be taken as a part of his answer." As additional proof that the object of the parties. standing, as they did, in the relation of creditors and debtors, was in all these contracts, the last no less than the first, merely to secure the payment of the debts, the conveyance of the personal property says, ipsissimis verbis, it was as "security for the payment of the said sum of money above mentioned." And the contract as to the real as well as personal estate, recites, that, after payment, the Cunards will "return and redeliver it," and "faithfully account" for such parts of the personal estate as they shall "dispose of in part payment" of the debts, etc., but not be liable for any of it lost by "accident or casualty." And there is no evidence whatever, or even a pretence, that prices were affixed, or agreed on, for any of the property, real or personal, in the last conveyance, any more than the previous ones, or any debts whatever, cancelled, or any money paid, or receipts, or discharges of demands given when any of the writings were executed. The whole arrangement, then, in equity, however it might be in law, must be considered a mortgage rather than an absolute sale, and rather than a mere special contract strictly to be fulfilled, or else to be treated as a nullity. Bentley v. Phelps [Case No. 1,331]. See Shapley v. Rangeley [Id. 12,-707]; Hunter v. Marlboro [Id. 6.908], and cases there cited; Flagg v. Mann [Id. 4,847]; 2 Story, Eq. Jur. § 1018; 4 Kent. Comm. 142. This conforms to the spirit of another stipulation, that the loss of any of the personal property by "accident" should fall on the Jewetts and not the Cunards. But unless it was a mortgage, such a stipulation would be either absurd or oppressive, as making a vender liable for losses after he had parted with the title entirely. Regarded as a mere security for the debts, these conveyances then show the amount due, and render it just that the grantee, on having his debts satisfied, either by income or sales of the property, should account for the rest by a reconveyance of the residue of the property, or if sold, by refunding its value. In this way it would operate like a mortgage, or pledge to secure a debt, with a power to sell and account. And the transaction, viewed as a whole, was meant to accomplish the payment in this way. though if paid in any other, there was another separate written arrangement to make a large deduction of money provided it was done within a given time. In both of these arrangements, if the parties looked further than security, and agreed for payment to be made by a particular day, as they do in cases of ordinary pledges and mortgages, equity will always step in, as it should, and prevent a forfeiture or penalty by non-payment at the day, if that payment be only made afterwards and interest, within such reasonable time as the laws allow to relieve debtors against accident or misfortune in not paying at the precise day, in case of pledges and mortgages. 1 Spence, Eq. Jur. 602, 604. This constructive relief is believed to have been the practice ever since the early portion of the seventeenth century in England, and became a settled part of the civil law as early as the fourth century. 1 Ch. R. 11.

It had been regarded as irreligious and contrary to good conscience. to take advantage of a forfeiture for non-payment at a particular day. ever since the council of Lateran, A. D. 1178. 1 Spence, Eq. Jur. 601. The courts of law resisted this construction, and this kind of relief. while it was gradually adopted in courts of equity. And though the common law judges in the sixteenth century refused. after a long conference. to acquiesce in the views of Lord Chancellor Moore, in favor of relief against penalties in bonds, he is said to have sworn "by the body of God"—that in chancery he would issue an injunction, if they continued to pursue the course of refusing to remit the penalty in such cases (Coop. Ch. Prac. 223), and now scarce a state in this Union, where no chancery court exists. has omitted to provide for such relief, in both bonds and mortgages, in cases at law. If the parties ever stipulate to prevent redemption, or prevent an account, as is done about the latter in one of these conveyances of personal estate. equity still relieves the party, if the transfer was clearly a security for a debt. Vernon v. Bethell, 2 Eden, 113; 2

Ball & B. 278; Gordon v. Lewis [Cases Nos. 5,613, 5,614]; 2 Story, Eq. Jur. § 1019; Co. Litt. 204, note; 4 Kent, Comm. 1426, 1424; 7 Watts, 261; Coote, Mortg. 21; 1 Spence, Eq. Jur. 604. Any other course would tend to usury to the borrower, so often a slave to the lender, or oppression on debtors generally, too often the victims of creditors. This view, being the correct one, it follows that the respondents are liable, not only for all their actual receipts, but for all which they might, by due diligence, have realized. This is well settled. See Upham v. Brooks [Case No. 16,797]; Jenkins v. Eldridge [Id. 7,268]; Taylor v. Benham, 5 How. [46 U. S.] 233. What a trustee loses by supine neglect, or gross inattention, he cannot justly refuse to account for. See cases in Taylor v. Benham [supra].

Here the plaintiff goes so far as to contend that in all the years, the income and sales of the estate have been such as to conform to the requisitions of the contract, even if regarded strictly and specially, and independent of the conveyances being mere securities for a debt. We shall, therefore, proceed to examine the case in that aspect, as well as the other, though if not proving to be rigidly complied with, the whole transaction, as a security for the debt, will also be considered at the same time, and if the debt and interest have been satisfied, or should have been upon equitable principles, under the stipulations of the contracts, any balance remaining ought, in our view, to be accounted for by the respondents. 4 Kent. Comm. 304; Humph. Prec. 16. Some objection is made to our doing this, on the score of jurisdiction. But this course is not taking jurisdiction over the subject, as one of fraud, and where as good a remedy exists at law, for mere damages, as in equity. 28 Me. 532. It is rather, in one view, taking jurisdiction over a case of the specific performance of a contract. That is, over a contract to pay certain balances back, or make reconveyances after paid, and in default of either, it is to enforce a specific performance, if practicable, and if not. to give damages as an indemnity. And in another view, it is exercising jurisdiction over a trust growing out of a mortgage. with power to sell, and making the trustee responsible only for receipts and gross neglect, as he should be, whenever they have happened. 4 Kent, Comm. 136; 1 Term R. 445; 5 Paige, 18; Taylor v. Benham, 5 How. [46 U. S.] 233; 12 Ves. 493. Among other things, it was here expressly provided, that if the income fell short of the amount agreed, either through "neglect" or mismanagement of the Cunards, it was to be deemed no breach by the Jewetts. and the time of payment was to be extended. The jurisdiction, in either of these views, is an ordinary one in equity, and entirely clear, as chancery powers extend peculiarly to specific performances, and to all trusts and mortgages. Watkins v. Holman, 16 Pet. [41 U. S.] 25; 4 Kent, Comm. 308. And the last need not be called, either, in the bill, if the facts, set out and proved, make them so. See 10 Johns. 395; 1 Ves. Sr. 491. It also may be proper for chancery, as a case of accounting between persons having a community of interest, and one acting as bailiff or receiver of the rest. A confidence is then reposed, which justifies a resort to chancery, and a discovery, whether under oath or not, of matters not equally in the knowledge of both. 1 Story, Eq. Jur. § 462, note; 6 Ves. 136; 5 Ves. 87; 12 Price, 502; Pierpont v. Fowle [Case No. 11,152]. These constitute the "stress," as Newbury calls it, upon which the case properly comes to the court on its equity side, and not a demand merely for damages, on account of any fraud or misfeasance which would be allowed at law. 1 Spence, Eq. Jur. 430; Harg. Law Tracts, 444; Warner v. Daniels [Case No. 17,181].

Proceeding then to the other material questions, the next one is, was the contract by Joshua Jewett to pay a certain sum yearly complied with, and the debt thus extinguished, and a balance left belonging to him, or regarding the transaction as a trust and mortgage, have the income and sales of the property been more than enough to discharge the debt and interest? This is a complicated enquiry, and after the lapse of so many years, difficult. tedious and surrounded by much conflicting evidence. But it is our duty to eviscerate from the mass of evidence and circumstances what is as near the truth as may be, though after all, the result will probably be only an approximation to it, rather than possessing much exactness and certainty. The best course will be to examine the first year by itself, because it is the test year, looking to the case as one of an independent special contract, and also as some guide for the other years, looking to the whole as a mortgage or trust. It was more a test also, because showing the real income, when there were persons, like the lessor and lessee, of antagonistic interest. to fix the prices and quantities of both what was bought and sold. and of united interests. likewise to make the income near what it should be, as both would thus realize more gain, and as one of the lessees was one of the cestui que trusts, and hence under double inducements so to manage and control as to increase the net proceeds. The accounts exhibited by the Cunards themselves, show a loss to the farm or estate for that year, of only £38, 4s, 1d, charging against it £390, 8s, 8d, a new debt due from the lessees personally. But the Cunards took the notes of the lessees for that debt, one of which was afterwards given up or paid, and the other in part satisfied, if not entirely, and no reason appears to exist for charging it to the estate, though not yet paid. Correcting that

error, then, the admitted balance on the account would stand in favor of the estate, £307, 4s, 7d, for the first year. The respondents concede, also, that there was on hand half the produce of the farm, for the season previous, which they afterwards credit at £111, 8s, 9d. This is, however, crediting the hay at only 60s per ton, when in other transactions hay is sold, and it is credited by themselves at 80s, which last price even, is rather lower than the average testimony on both sides, and allowing only that 20s more per ton for thirty tons, is £30, making the produce equal to £141, 8s, 9d. This added to the other £307, 4s, 7d, makes a balance of £448, 13s, 4d. Besides this, three oxen are credited for beef that year, and a new pair bought and charged. I think this charge allowable, as they may have been needed in the place of others. But the latter are put at the rate of one hundred per cent. higher than the others, when, for aught which appears, their value was alike, or nearly so. The first oxen, when killed for beef, should, therefore, be credited quite one hundred per cent. higher than they are, so as to be equal in price to that charged by the Cunards for other beef that year and the next. This requires £47 more, including, in a like ratio, a fat cow killed. To this should be added two oxen allowed to die that year from neglect and starvation, and several swine, at least £40, and one cow sold . . . . . . .    £   4    10s
.                                              40
                                             47

These make . . . . . . . . . . . . . . : . . .   £ 91   10s
To this add as before . . . . . . .    448   13s   4d

All these amount to . . . . . . . .   £540   3s   4d

Now, sanctioning the trade in horses, which may have been useful and competent, under the power to sell and buy, granting the repairs and the work on the shop, as the economy in managing the farm the ensuing years, as well as that year, were probably improved thereby, and the sales of it higher in 1834, and not deducting several questionable items, such as horseways, chain-traces, etc., etc., because in some views permissible, and these matters will continue to stand in the account, except that the commissions of £7 on the duties paid are not admissible, and the repairs of £15, 9s, 6d. are more properly chargeable to the year A. D. 1834. Add these to the £540, 3s, 4d, and the aggregate balance is £572, 12s. The pound in New Brunswick is about $4.00 of our currency. The net income from the estate in all ways, realized the first year, would be about $2,290. I do not think it necessary for the account in the first year, standing by itself, to discriminate exactly between what was mere rent, and what were receipts from sales of property, and the value of what should have been realized, and what was lost by neglect. The Cunards were to apply the first year all which could be "realized out of said real and personal estate," by due attention and care. If let, it was to be let to hire, "to the best possible advantage," and there is no discrimination, in the contract, between what was to be derived from actual rent or otherwise, but all realized is embraced under "rents and advantages," and the obligation "to faithfully account" for the personal property. Nor should the respondents complain of this, when they themselves, beside rent, have credited the cattle killed to the estate the first year, and when, if they pay such items then, as were then realized, or might have been, or were then lost by neglect, they will not be obliged to account for them again at the close of the transaction. Under the special contract, the amount to be realized the first year, was £550, or $2,200. It will be seen that there was, or should have been, actually realized, under our computations, $2,290.40, making an excess of $90.40. More might be added in some views, and some in other views subtracted. As, for instance, I do not add to this anything for the larger quantity of lumber that many witnesses testify might have been got in and sawed there that year; nor anything for the higher prices which ought to have been allowed for that actually sawed, as several others testify. Because there is evidence that the complainant assented to the employment of Bryce Jewett as one lessee, and also to Beck, who joined with Bryce, though he preferred Varrel, I think that after such an assent, it is not competent for him to complain of the general results under their joint lease, though he is still at liberty to show specific neglect and losses caused by their inattention, which the Cunards should have made them liable for, and which the complainant could resort to the Cunards for. Standing thus, then, the first year, regarded under the contract as a special one, accomplished all required of it. And J. Cunard, instead of declining to settle with the complainant, as he did, instead of refusing to credit to him anything, instead of allowing what was proper, amounting to a large sum, as then claimed by Jewett, and not fabricated since, should have made an exhibit of all the accounts that year such as is now annexed to his answers. He should have then examined the complainant's claims, as presented in January after, and attempted to come to an amicable arrangement for that year, and made some mutual agreement who should control the estate under the Cunards the second year. But Cunard, on the contrary, peremptorily refused to allow anything. He did not consult the complainant as to whom he should employ the second year. He failed to obtain a lessee the second year, who was agreeable to him, deprived Bryce Jewett, one of the former lessees and parties in interest, and nominee of the complainant, of all control over the es-

tate, though permitting him to work there some as a hired man, and gave the immediate superintendence and management to Beck, on monthly wages, though he had acquired the character with many, by his conduct the first year, of an incompetent and unfaithful manager. This last is dissented to by others, but the results of his superintendence afterwards, when alone controlling at Ludlow, though his brother-in-law supervised him from Chatham, served still more strongly to show his unfitness, when alone, for such a position. They do this, even if looking only to the exhibits made by the respondents themselves.

The whole estate is represented by them in the second year, as running itself in debt near $2,640, instead of yielding any net income, and this, though it is admitted to have produced such an income the first year, of $350, and did in truth produce one of near $2,000. Again, after this disastrous result the second year, Beck was still retained in control the third year, and no notice given to the plaintiffs of this great loss. Another loss is exhibited of near $2,000 more, and yet Beck retained through most of the fourth year, with like returns of indebtedness and loss, and like neglect to notify the plaintiffs. Again, the very idea of a large real-estate, estimated in value at near $20,000, and perhaps justly at over $10,000, and personal estate estimated at $4,000, being not able to be made to yield any rent whatever, but subjecting the owner to a necessary loss of $2,000 a year, is almost incredible, when the estate, as here, consisted of some nine hundred acres of land, besides a timber lot, near one hundred and sixty of it in mowing, tillage and pasture, cutting from fifty to eighty tons of hay yearly, having valuable mills, and a stock of thirteen oxen, seven cows, six horses, and over thirty sheep. So the idea is almost absurd, that when several witnesses were willing to run the mill at the halves, and others to give rent for the estate, and when it has been at times rented in both ways, the management could have been good or faithful, which not only failed to produce any rent, but run it in debt over $2,000 a year, in both the second and third years, and in like proportion for the fourth. Next, beside the use for nothing, of all the land, cattle and horses, and mill, it is remarkable that the lumber is made to cost per thousand over $18.00, when the usual cost is less than $8.00, and when it was all sold for less than $9.00, only about one-half its cost. Under the exhibits here, we have no means of computing any details as to the number of men employed, or their wages, or the actual price of their board. But the probability from the exhibit is, that quite double the usual quantities were either consumed or wasted, and it is certain that the result must early have admonished a prudent man, who closely supervised the matter as trustee, that

he should employ Beck no longer, or if he believed the great deficiency to arise, not from Beck's incompetence or neglect, but the position and condition of the property, should stop carrying it on longer, and let it lie idle, as much the most profitable course to both the creditors and debtors. At least it would then run neither in debt till the two Jewetts could be and were further advised with, and their wishes consulted. But notwithstanding all this, it appears by the respondents' own exhibits, that while the gross charges increased yearly, and the gross receipts diminished yearly, and instead of any income, larger debts were accumulating, yet he pushed on, and no change of agent was made, nor any stop put to so ruinous a career.

| These gross charges— | | Receipts of lumber |
|---|---|---|
| in 1831 were. | £1,031 | 327,227 feet |
| in 1832 | 1,349 | 293,075 |
| in 1833 | 1,388 | 265,673 |

As the case now stands, we have ascertained not only the income the first year, but the facts are entirely defective to exonerate the trustee from being chargeable with neglect and ruinous mismanagement by those employed under him in the subsequent years. It follows, therefore, necessarily, that we must enquire into, not merely the actual receipts and expenditures during the subsequent years, but what they should and would have been, under a careful and faithful supervision. One of two courses must be adopted in order to ascertain what the just amount is, to charge the trustee with, during those subsequent years. Either we must have each item of debt and credit scrutinized, and the proper amount fixed on special evidence, and then add to our sums against the trustee all lost by clear mismanagement and neglect in each particular, or we must endeavor to reach a like result, near as may be, by the general data and evidence now before us. Attempting this last, I see no course so obvious and apparently just under this view, and indeed under the general aspect of the whole case, as to take the year, which can be ascertained as to its true income, for the general guide in relation to the others, charging the trustee then with the amount already ascertained to be proper for the first year. I think the three subsequent years should correspond to that, after making suitable allowances and additions, required by the evidence and the nature of the case, in order to reach the true annual income. All charged the first year, is not income of that year, but in part sales, losses, crops on hand, etc. Such a course is likely to be as near what is just to the complainant, as a minute and expensive scrutiny and proof about every item, nor can it be oppressive to either side. It will give to the former no more than was actually realized the first year by the respondents, after correcting what was not annual income, keep-

ing the temporary distinct from the permanent, and will devolve on the respondents no greater charge than they actually credit to the farm the first year, making all appropriate amendments and additions. How much of this may be regarded as real rents, how much for advantages not improved from neglect, and how much for personal property sold, is not very material to the final result, but is properly discriminated in fixing what is technically annual income, but will be obvious enough on an analysis of the case, and the accounts rendered and printed with the record.

Let us then attempt to make the proper corrections in the aggregate charge for the first year, as a guide to the subsequent years, in respect to the true annual income. The complainant has been shown to be entitled to $2,290.40 for the first year, for every advantage enjoyed by Cunard in that year. But it is manifest, on a little enquiry, that though this was the entire sum which was then realized, or ought to have been, by the trustee under the lease, yet it was not the exact or net sum which the estate was likely to have yielded him as mere annual income, under good management, had he carried it on in person, nor what it was likely to yield in the three subsequent years. In that year £390 were lost by the lessees, to appearance on the accounts, but the real loss was less, as this was subject to a deduction for half the crops they had on hand, which belonged to them, being, as before seen, under the corrected prices, about £141, 8s, 9d. They also received other credits for work and services in that year, and lumber, some of which were not deducted at the settlement, but credited in the next year at

| | | | |
|---|---:|---:|---:|
| about ..................... | £ 73 | | |
| | 141 | 8s | 9d |
| | £214 | 8s | 9d |

| | | | |
|---|---:|---:|---:|
| From the apparent loss.... | £390 | | |
| Deduct ................... | 214 | 8s | 9d |
| And the balance lost is..... | £175 | 11s | 3d |

| | | | |
|---|---:|---:|---:|
| Deduct from the whole receipts of 1830–1 credited.. | £572 | 12s | 0d |
| | 175 | 11s | 3d |
| And ..................... | £397 | 0s | 9d |

is the balance as net gain to the farm for annual income the first year. But in this are still contained some items, not strictly annual income, though properly chargeable to Cunard in that year, such as cattle sold or killed over those bought at prices in the account ................... £ 15 0s 0d

| | | | |
|---|---:|---:|---:|
| count ................... | £ 15 | 0s | 0d |
| So crops on hand in October, 1830 ................... | 101 | 0s | 0d |
| So cattle and swine lost by neglect ................... | 40 | 0s | 0d |
| | £156 | 0s | 0d |

| | | | |
|---|---:|---:|---:|
| Deduct this from the....... | £397 | 0s | 9d |
| | 156 | 0s | 0d |
| And it leaves................£241 | | 0s | 9d |

as net annual income, without additions from other sources.

From this some other reductions might be made, in some views, and under others, some additions made to it. Thus it might be reduced more for a guide for coming years, as there was some less stock to be rented out to yield an income. But that seems quite overbalanced by the neglect to keep the remaining stock in good order for the production of young, and for which no separate charge will be made in the ensuing years.

Let us then take this corrected and reduced sum of £241, 0s, 9d, as the standard, and it seems to me a moderate standard, for the mere annual income during the ensuing years.

| | | | |
|---|---:|---:|---:|
| Following it for the second year, it constitutes the first item for that year........ | £241 | 0s | 9d |
| Add for stock sold in that year to be accounted for.. | 102 | 15s | 0d |
| | £343 | 15s | 9d |

This last is the aggregate, properly chargeable to the trustee for the second year by analogy to the first one, after all due corrections for this purpose.

| | | | |
|---|---:|---:|---:|
| For the third year, a like sum as annual income, without the stock sold.... | £241 | 0s | 9d |
| Add for stock sold and other items credited to that year ..................... | 229 | 14s | 0d |
| They make united.......... | £470 | 14s | 9d |

For the fourth year, ending at the sale in June, and business nearly finished, charge as the second year, without stock, viz........ £241 0s 9d

The four years would then stand at income from land and mill, and stock sold or lost, or killed, in each year:

| | | | |
|---|---:|---:|---:|
| First year............. | £ 572 | 12s | 0d |
| Second year........... | 343 | 15s | 9d |
| Third year............. | 470 | 14s | 9d |
| Fourth year............ | 241 | 0s | 9d |
| Aggregate ............. | £1,628 | 3s | 3d |

| | | | |
|---|---:|---:|---:|
| Add personal property sold in June, 1834, deducting lumber and work and seed then on the farm......... | 482 | 3s | 8d |
| Personal estate not then or before acounted for...... | 65 | 0s | 0d |
| Sale of real-estate........ | 2,150 | 0s | 0d |
| Total ................. | £4,325 | 6s | 11d |
| Interest on these from time due till 1st July, 1834.... | 165 | 0s | 0d |
| Whole ................. | £4,490 | 6s | 11d |

·On the contrary the original
debts were............... £2,884   16s  11d
Paid by Cunard towards one
lot swine ....·..·..........  ·   33   0s   6d
Work on the shop done in
the 1st year..............   15   9s   6d
(There are other losses
·charged for various claims
and operations, none of
which accompanied by any
evidence to render them al-
lowable.)

    Aggregate debt......... £2,933   6s  11d
Interest on this, chiefly from
1st October, 1830, to July
1st, 1834................   700   0s   0d

    In all................. £3,633   6s  11d

Deduct this from the re-
ceipts ................... £4,490   6s  11d
                       3,633   6s  11d

    Balance ............... £ 857   0s   0d

This is near $3,428.12. The whole sum due from the respondents being $3,428.12, of this, seven-eighths, which is the share of the plaintiffs, would be $2,999.62. Interest on this for thirteen years and a third, is about $2,399.40. This makes now due, in all, about $5,399.

To show that some other considerations have not been overlooked in coming to these general conclusions, a few further explanations may be proper. Thus I should feel disposed to deduct from this quite ten per cent. for the increased expense and difficulty likely to exist yearly of obtaining logs. While, on the contrary, something seems chargeable on the evidence even the first, as well as subsequent years, for neglect and unfaithfulness in not getting so much lumber out and sawed yearly, as the business and mill, well managed. could have realized, and, in the next place, for not accounting for so high prices as might be proper, if the accounts of the sales by Cunard and Company were exhibited. It is the duty of the trustee to exhibit those sales, if he would discharge himself. He acted for others, as well as himself, and should not expect them to rely on prices put down at his pleasure, not giving to them any validity by an actual agreement or assent of either of the Jewetts, or any lessee, to this amount; or by any proof that he realized no more net value from the sale of that or similar lumber, in those subsequent years. As to the quantity of lumber, also, the evidence is in favor of the mill being able to cut six hundred thousand yearly, instead of less than three hundred thousand. the quantities accounted for. The quantities received in some previous years from the complainant. are no true guide here, as in those years he had but half the proceeds sometimes, and but a quarter at others, and worked more at square timber. But

the year we have adopted as a guide was one devoted to this business exclusively, was under lessees interested to get higher prices and a large quantity, and though both were, perhaps, less, from Beck's inexperience and want of attention, yet, under all the circumstances, and under a general view, it is better to let the result in the first year govern, without adding to it either quantity or price, or deducting from it anything on account of any increased scarcity or distance of the timber. These can stand set off against each other, and must, unless a master goes into an expensive and protracted inquiry. Where precise data are not attainable in a complicated account by a trustee or mortgagee in possession, if any fixed and pretty certain general grounds can be obtained, they are the truest clue and guide amidst a labyrinth of contradictory evidence. The first year furnishes some such grounds here, as in that year parties in interest existed, who had the control, and were consulted on both sides, and were competent to fix the prices properly, both of what was bought, and what was sold, and paid high, even ten per cent. addition for what they bought of the Cunards. But in other years, the respondents charged what they pleased, both in price and amount, credited what they pleased, and forbade Bryce Jewett, one of the debtors, to be present at the surveys, in order to secure more of the lumber from being put down as refuse. and thus largely reducing its price. It is proved, likewise, that some persons did secure themselves against this result, by being present and remonstrating with the surveyors at Chatham. It is shown, also, that the Cunards required the lumber to be as much as possible in deals, which prevented a survey of so much clear stuff as there otherwise might have been with higher prices.

Considerations like these, in the absence of more precise testimony, show that no injustice is likely to be done to the respondents by taking the first year as a guide in respect to the lumber, without addition or subtraction, and allowing some apparently reasonable differences from it on both sides to stand counterbalanced by each other, nor can the complainant object to that, when his own son and co-debtor was one of the lessees in the first year. and acting as such. under his approbation. On the other hand, too, as a test for the subsequent years, it is to be considered that the Cunards have no ground to object to this, as they are in this way required to account for only what they received. and ought to have realized, judging from an actual experiment made the first year, and in addition to that, are allowed their own profits on all the supplies furnished, and on all the lumber received and sold by them from this estate. These pay them well without, and instead of, other commissions, which are seldom to be charged by trustees in such situations. Another general test of the correctness of this general result, as between these

parties, is its conformity to what ought to be expected from the situation and value of this property. If the value of the whole was as large as estimated by Jewett, the net proceeds we have computed would not be two per cent., not one-quarter as much as might be anticipated from very productive estates of that value. While, if the value was only about $15,000, six per cent. on that would be $900, which is but little over the annual income fixed by us, deducting losses by stock sold and starved, and credits for some crops on hand at the beginning of the year. The whole real and personal estate may have been worth something less than $15,000. The estate sold in 1834 for somewhat less than that, but adding the portions of the personal estate, which had been disposed of and lost, not less, by a sum greater than might be expected, after the property had been in such a wasteful and ruinous management, and bad reputation as it acquired during the few previous years. On the other hand, it is hardly credible that an estate consisting of three or four thousand dollars of productive personal property, cattle, horses, sheep and swine, and of land that yielded sixty tons of hay per annum, and the potatoes, oats and wheat and pasturage this one did, with a new saw-mill and a privilege to cut logs from the reserve at so low a duty, could be supposed to yield much less than six per cent., or be much less in value in the aggregate in A. D. 1830, than from $12,000 to $15,000. At all events, nobody could believe it would yield nothing whatever, of net profits annually, and for a series of years must run a prudent possessor in debt some $2,000 annually.

It has been asked how the debtors in this case could be possessed of so valuable an estate, beginning in 1820 with small means, and cultivating it but ten years; and if it was so valuable, how Jewett became so much in debt to the Cunards. The answer is very obvious, and rather sustains than impugns this supposed value. The debts were incurred in getting means to help to pay for this very estate, and to improve it by erecting mills, houses, barns, etc., and stocking it, and these constituted a large portion of the $11,000 debt, and were incorporated into their value. Add to this the labor of Jewett and his two or three sons for ten years, allowing the rest of his family to maintain themselves, and ample means exist to make up our $15,000 or $20,000 and some losses which Jewett sustained in 1826. But take a different method of arranging these accounts and claims for damages by neglect. If all these data and guides to general results for the years subsequent to the first one were abandoned, and if we were to require any apparent neglect in not cutting sufficient lumber, or getting sufficient prices for it, to be atoned for, and a minute examination of details and contradictory evidence in other things was instituted, the re-

sult, as computed by the plaintiff, would be much more favorable to him, while the respondents insist it would exonerate them from paying over any balance. The truth, in this way, could not, therefore, be attained, probably, without much more delay, evidence and expense. More light on several particulars could undoubtedly be flung on the case by more evidence which exists, and is in the power of the parties, but has not been laid before us. But the conclusion could not probably be much varied by such a protracted inquiry before a master, as only a few of the special points involved could be submitted, and acted upon by a master, and no motion has been made on either side to submit further evidence to the court, whose duty it is to decide everything material. We must, as we have, decide what are the true constructions of the contracts and conveyances, the question of our jurisdiction over them, and the fact of negligence by the respondents, and their liability for what would have been made from the property yearly, by greater attention and economy, no less than for what was actually received by them. Nothing is proper, in a case like this, to be devolved on a master in any sound view, except mere matters of debt and credit. 1 Spence, Eq. Jur. 364. The twelve masters were originally designed as a sort of jury in chancery for that purpose, whenever the court finds occasion for it, and has not the means of stating the account before it, and a master is generally appointed, if desired and convenient. But here it is not necessary, when, as already shown, we have before us means, and have used them, for reaching what is probably just on the general data and general principles we have been considering. Yet if a master was desired here, by both parties, each thinking the result could, on more detailed evidence, be made more satisfactory, I would cheerfully appoint one, as neither could, in that event, complain of the additional delay and expense. But otherwise it can hardly be justified.

I have thus given some views of the merits, resting chiefly for the last years on general considerations connected with the first year. But we have not been inattentive to the details on the evidence as now standing, and if obliged to dispose of it on the present testimony, rather than the general data already suggested, the result would be a still larger balance against the respondents. It would arise on account of the neglect to improve all the advantages of the timber and mill, and of which the weight of evidence shows them to have been susceptible, and on account of the low prices allowed for the lumber, with no account of its sales produced, and the apparently extravagant and wasteful amount of supplies furnished to Beck. But the other mode of fixing the balance, we consider less liable to error, where the testimony is so contradictory, the lapse of time since so long, and the proof so defec-

tive, as to the necessity for such an extraordinary quantity of supplies, for such small results. Of this general balance, the complainant, as before suggested, is entitled only to seven-eighths, and till further evidence is laid before us, the other eighth must be left to be decided in another proceeding, if it be still unsettled between Bryce Jewett and the respondents, or in this case, if it may hereafter be presented, under proper pleadings and expositions made in behalf of Bryce against his co-defendants, the Cunards. Decree for Joshua Jewett for the amount before considered as proper.

At the subsequent term, in May, 1848, a question arose as to costs between these parties in an action at law, which had been instituted between them as early as October, 1839. It was entered in the state court, and afterwards transferred by the defendants to the circuit court. It contained counts for money had and received, for money paid, and one on the final agreement made October 1st, 1830, between these parties, which is the chief ground of recovery in the bill in chancery just reported. This last count sets out most of that agreement and the debts, and conveyance of property by Joshua Jewett separately, and Bryce separately in some cases, and in others by both together, and avers that, in consequence of them, a promise was made to carry on and use the farm, mills and others property to the best advantage, that the defendants took possession of the property, and it ought to have realized the sum stipulated, and was held long enough to yield it, if properly managed. In conclusion, there was an averment that it did yield enough, and that the plaintiff demanded a reconveyance, which the defendants refused, and sold the property for a large sum of money, viz. $100,000, which, though requested, they have never paid over to him. When the original case came on for trial here, October term, 1843, the presiding judge thought the parties had better agree to a continuance of the action at law till a bill in chancery could be instituted, and the merits of the claims and accounts between them be more fully and justly examined in that way than in an action at law. Accordingly, a written agreement was signed between them to carry into effect that recommendation, a copy of which is annexed.

(Copy.) "Jewett v. Cunard. It is agreed in the above suit that Edward Kent and W. P. Fessenden, counsel for the defendants, will appear and answer for said defendants to any bill in equity which may be brought by Joshua Jewett and Bryce Jewett, or either of them, in the circuit court of the United States for Maine district, against said defendants in relation to the subject matter of the aforesaid suit, within six months next ensuing, not waiving any exceptions that may be taken to said bill. It is also agreed on both sides that the aforesaid suit at law, between Joshua Jewett and said Cunards, shall be continued without costs after this term, until a final decree in said suit in equity, and if, by the decree therein, and in the opinion of the court, it shall appear that said suit at law could have been maintained against said Cunards, costs may be allowed said Jewett, if, in the opinion of the court, he would have been entitled thereto—otherwise, costs are to be allowed said defendants, if, in the opinion of the court, they would have been entitled to the same, either from defects in the form of said suit, or upon any other legal ground, properly to be considered in said question of costs. (Signed) E. Kent. W. P. Fessenden. F. Allen. F. D. L. Fessenden. Circuit Court, U. S., October Term, 1843, Maine District."

Under this agreement each party now moved for the costs in the action at law, which had accrued before the bill in equity was brought, and the motion was argued by

Samuel Fessenden, for plaintiffs.

Mr. Kent and W. P. Fessenden, for defendants.

WOODBURY, Circuit Justice, observed that the first objection was to the action at law being sustainable in the name of Joshua Jewett alone. But he felt satisfied that an action at law could be sustained on the special agreement by Joshua Jewett alone to the extent of his separate interests in the property. To that extent his own exclusive estate had been conveyed to the Cunards, and had been used and sold by them, so as to help with the rest to realize more than he was indebted to them, or which would have yielded more if properly managed. The correctness of this view is manifest, not only from the cases cited in the opinion on the bill in chancery, but in various other cases at law on contracts not sealed, and in which one of several promisees appears to have some separate interest, either on account of the consideration in part emanating from him separately, or the benefit in part being to him separately. Ham. Parties, 20, 21; 1 Saund. 154, note; Lilly v. Hodges, 8 Mod. 166; 13 East, 538; Farmer v. Stewart, 2 N. H. 97; 3 Caines, 53; [Hall v. Leigh] 8 Cranch [12 U. S.] 50; 2 Mass. 401. Though a promise in such cases is technically made to two, if it appears to be for the benefit of one, or is to be performed to one, he alone may sue. Place v. Delegal, 4 Bing. (N. C.) 427. From some cases this seems to be the rule, even in sealed instruments, such as covenants. James v. Emery, 8 Taunt. 245; Browne, Act. 118, and cases there cited. The proportion of the whole balance which Joshua Jewett ought to have recovered at law in this case might not be the same allowed in equity, as that sum was founded on an admission as to the true amount of all his interest, several and joint, and on the fact not existing here, that his son, the other party in interest, was there

one of the defendants. But the proportion out of the balance, which at law would belong to Joshua Jewett alone, might perhaps be in the ratio of his separate debt and separate property to the whole debt and whole property conveyed. There is no objection to the institution of as many suits on this one contract as there are distinct interests; and these would cause no more cost or litigation, than if there had been as many different papers, and a contract to each claimant or class on each of them, instead of all being on one paper, and in one contract. The test is the separate consideration and separate interest appearing on the face of the contract.

Another objection is, that Joshua Jewett, alone or with Bryce Jewett, could not, at law, have recovered on the special agreement, because the amount stipulated to be paid yearly on the interest in the property to be forfeited, was not received by the Cunards, nor able to be obtained by prudent and skillful management of the estate each year, till the sale. But we have already decided in the bill in equity, that enough to answer the stipulation was actually received the first year; and it is manifest from that case that more than enough was realized from the income and sales the last year. The other two years fell short, though partly from mismanagement, in which case of mismanagement it was expressly agreed that longer time should be given for payment. As this mismanagement was not the sole cause of the deficiency, I do not feel entirely satisfied that a recovery could be had at law on the special contract, as the declaration now stands, without an averment that the deficiency in the second and third years arose from mismanagement. Nor am I convinced that a recovery can be had at law on the general money counts predicated wholly on the special agreement, if it cannot be had on the agreement itself, or could not be had on it after an amendment of the count on it. But as no motion has yet been made for an amendment of the special count, it is not necessary to say more on that view of the question, and especially as the money counts apply to another view of the transaction more free from difficulty. That other view is this. The opinion on the bill in equity holds the transaction as a whole to have been a mortgage with a power to sell the property and account for the proceeds. It considers that view clear in equity, and states facts enough to render it a mortgage at law, or at least to render the grantees liable in law to account for all moneys received, or able to be received by proper care in income and sales of the estate, beyond their debts. This liability is shown from all the writings in the case, including others than the special contract of October, 1830, and from the admission in the answers. If, therefore, on all the facts a balance of money thus remained in their hands, they were liable in law to refund it on the count for money had and received. This is the drift of the opinion

and decree, though not there required to be gone into in detail, as in equity no question existed, that the conveyances were mortgages, with a power to sell, and a liability to account.

We are sometimes misled as to jurisdiction at law by the words "trust" and "trustees," over which equity has full jurisdiction. But still jurisdiction over them exists, likewise, at law for many purposes, and especially to close them up when all the objects of the trust are accomplished, and a balance in money remains. Assumpsit ex aequo et bono lies for that balance, as here, so far as Joshua Jewett is separately interested. Because, by charging the respondents, first with the actual income, then with the deficiencies by mismanagement, and lastly with the proceeds of all the sales, the balance found in the bill remains to be accounted for and paid over, and would be recoverable at law. And though the second item is not money itself, it is an account chargeable by law, and if so charged with the income, as is proper, leaves a balance in money from the sales, which is appropriately subject to an action at law. Let judgment be entered for the plaintiffs, for costs up to the date of the agreement.